**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1604-18T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

DAMARY DIAZ, a/k/a
DAMARIS DIAZ and
DAMARY DIAZ-TELEDO,

 Defendant-Appellant.

_____

  Submitted December 1, 2020 – Decided  February 1, 2021

  Before Judges Fisher, Gilson and Gummer.

  On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-09-0878.

  Joseph E. Krakora, Public Defender, attorney for appellant (Michael A. Priarone, Designated Counsel, on the brief).

  Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Stephen C. Sayer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Damary Diaz of second-degree conspiracy to distribute cocaine in violation of N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-5(b)(1). She was sentenced to nine years in prison with four and a half years of parole ineligibility. She now appeals, challenging her conviction and sentence. We discern no reversible errors and affirm.

I.

Defendant and six co-defendants were indicted for conspiracy to distribute cocaine. The charges arose out of an investigation conducted by the United States Postal Inspection Service and the Cumberland County Prosecutor's Office.

Before trial, two co-defendants – Daniel Diaz and Ana Cartagena – pled guilty to conspiracy to distribute cocaine. Daniel is defendant's brother. Cartagena, who testified against defendant at trial, explained that she knew both defendant and Daniel and Daniel had asked her to receive certain packages on defendant's behalf.[1]

In 2014, inspectors for the United States Postal Service received a tip from Daniel Fontanez that cocaine was being mailed from Puerto Rico to certain addresses in Bridgeton, New Jersey. Fontanez had lived at one of the addresses,

---

[1] We refer to Daniel Diaz as Daniel so as not to confuse him with defendant.

A-1604-18T3

501 North Pearl Street.   When Fontanez made his disclosure to the postal service, he was a cooperating defendant in an unrelated federal drug prosecution.

Postal inspectors reviewed records of packages mailed from Puerto Rico to several addresses in Bridgeton, including 35 Duchess Place, 37 Duchess Place, 481 Indian Avenue, 501 North Pearl Street, and 53 Monroe Street.[2] Defendant and co-defendant Jose Delgado lived at 35 Duchess Place, and defendant operated her automobile towing business out of 37 Duchess Place. Other co-defendants, including Daniel and Cartagena, lived at the other addresses.

Postal inspectors alerted the prosecutor's office, and surveillances were conducted at several of the addresses on various dates.   During those surveillances, defendant was seen collecting packages sent from Puerto Rico to different addresses in Bridgeton.   Thereafter, investigators obtained a search warrant, intercepted two packages, and opened them.  Those packages contained ornamental wooden books, and inside those books law enforcement personnel found four kilos of cocaine.  Investigators then installed devices to alert them when the packages were next opened, repackaged the books with "sham bricks"

---

[2]  The addresses were sometimes referred to as being in towns located near or around Bridgeton.

composed of benign substances and a representative sample of the narcotics, and had the packages delivered.

On April 23, 2016, the packages were delivered to two addresses: 481 Indian Avenue and 501 North Pearl Street. Co-defendant Delgado and co-defendant Juan Toledo-Soto collected the packages, which were subsequently taken to 37 Duchess Place. Shortly thereafter, investigators received an alert that one of the packages had been opened and the cocaine inside had been accessed. Law enforcement officers, bearing a search warrant, then entered the building. No one was inside, but a surveillance system at the house showed that Delgado had fled the building shortly before the police arrived. The surveillance video also showed Delgado carrying two bricks out of the rear of the residence and placing them inside a vehicle before running. Delgado was located and arrested in April 2017. The triggering package was found in a back room in the rear of the house at 37 Duchess Place. During the search of the house, law enforcement officers found $1,000 in cash, a scale, and numerous empty wooden books. They also found a financial ledger and priority mail boxes.

Cartagena testified that she was with defendant in Puerto Rico on April 23, 2016, the day law enforcement officers searched 37 Duchess Place. She explained that defendant received a phone call from co-defendant Ashley

Acevedo-Diaz, who is defendant's daughter. Acevedo-Diaz told defendant that police had raided the house. According to Cartagena, defendant was "freaking out" after the phone call from Acevedo-Diaz. The following day, defendant instructed Acevedo-Diaz to remove "everything" from a storage unit. Defendant later spoke with co-defendant Delgado by phone and told him everything had been taken care of.

As part of their investigation, the postal service identified co-defendant Ivan Gomez as the person who was mailing the packages from Puerto Rico. Gomez is defendant's godfather.

The State first identified Fontanez to defendants during trial at a Rule 104 hearing, which was conducted outside the presence of the jury. An investigator testified that Fontanez had supplied information that suggested drugs were being mailed "to either one, or a number of the addresses" in Bridgeton. The investigator did not state that Fontanez had identified defendant.

Defendant's counsel moved for a mistrial, arguing that the State should have disclosed Fontanez's involvement during discovery. The trial court denied that motion but prohibited the State from introducing evidence about Fontanez or any statements he had made that triggered the initial investigation.

A-1604-18T3

Accordingly, the State did not initially elicit testimony concerning Fontanez. Instead, in cross-examining one of the investigators, counsel for co-defendant Gomez asked about and elicited testimony concerning Fontanez and the initiation of the investigation. Thereafter, Fontanez was discussed several times during cross-examination of other investigators. Co-defendant Gomez also testified on direct examination that Fontanez had lived with Daniel at 501 North Pearl Street.

Testimony at trial also revealed that Daniel and Cartagena had pled guilty to conspiracy to distribute cocaine. The testimony about Cartagena pleading guilty came out during cross-examination of an investigator by counsel for co-defendant Gomez. Subsequently, co-defendant Gomez testified that Daniel had pled guilty to conspiracy. Defendant did not object to any of that testimony. Defendant also did not object when the State asked follow-up questions concerning Cartagena's and Daniel's guilty pleas.

Defendant elected to testify at trial. She explained that she practiced the Santeria religion and that she had received religious artifacts shipped from Puerto Rico for her shrine at 35 Duchess Place. She acknowledged picking up packages and contended that she thought those packages contained religious articles sent by her godfather Gomez. She also explained that Daniel had asked

6

her to pick up packages.  Finally, she testified that she did not knowingly receive any packages containing narcotics and had never seen narcotics in her home.

Co-defendant Gomez also testified.  He stated that Daniel had asked him to mail packages from Puerto Rico as a favor, but he did not know what was in the packages when he mailed them.  He also contended that he separately had mailed Santeria-related items to defendant.

In reviewing the jury charges, the trial court and counsel discussed an instruction regarding Cartagena's guilty plea.  Ultimately, the trial court instructed the jury that Cartagena's guilty plea was not evidence of defendant's guilt but could be used in determining Cartagena's credibility. The court did not give a similar instruction concerning Daniel's guilty plea.

Thereafter, during closing arguments, defendant's counsel stated that Daniel had pled guilty to conspiracy and argued that Daniel had asked defendant to pick up some of the packages to protect himself.  In response, the State argued in its closing that Daniel was guilty of conspiracy but was not the ringleader of the conspiracy.

After hearing the evidence, the jury found defendant guilty of conspiracy to distribute cocaine.  Defendant now appeals from her conviction and sentence.

A-1604-18T3

## II.

On appeal, defendant argues that she did not receive a fair trial because she could not confront Fontanez about the initiation of the investigation or Daniel about his guilty plea. She also argues that her sentence was illegal. Specifically, she articulates her arguments as follows:

> I. DEFENDANT WAS DEPRIVED OF A FAIR TRIAL AND HER SIXTH AMENDMENT RIGHT TO CONFRONTATION BY THE REPEATED ADMISSION OF EVIDENCE THAT AN INFORMANT, WHO NEVER TESTIFIED, HAD TOLD AUTHORITIES THAT SHE WAS TRAFFICKING COCAINE[.]
>
> II. DEFENDANT WAS DENIED A FAIR TRIAL AND HER RIGHT TO CONFRONTATION BY THE ADMISSION OF EVIDENCE THAT DANIEL DIAZ, PREVIOUSLY A CO-DEFENDANT, HAD PLED GUILTY TO THE CONSPIRACY DEFENDANT WAS BEING TRIED FOR[.]
>
> III. CUMULATIVE ERROR DEPRIVED DEFENDANT OF A FAIR TRIAL AND REQUIRES THAT DEFENDANT'S CONVICTION AND SENTENCE BE REVERSED.
>
> IV. DEFENDANT'S SENTENCE IS ILLEGAL AND EXCESSIVE AS BASED ON FACTS NOT PART OF THE RECORD AND A RESULT OF THE TRIAL COURT'S RELIANCE ON EXTRA-JUDICIAL FACTS, DISREGARD OF MITIGATING FACTOR 7 (LACK OF A PRIOR CRIMINAL RECORD), IMPROPER RELIANCE ON AGGRAVATING FACTOR 5 (ORGANIZED

CRIMINAL ACTIVITY) IN THE ABSENCE OF A JURY FINDING TO THAT EFFECT AND A RESULTANT ERRONOUS [sic] BALANCING OF AGGRAVATING AND MITIGATING FACTORS[.]

A.    The Testimony Concerning Fontanez

Defendant argues that her constitutional right to confront witnesses against her was violated.   The Sixth Amendment to the United States Constitution, made applicable to the State through the Fourteenth Amendment, provides an accused the right to be confronted with witnesses against him or her. U.S. Const. amend. VI; State v. Roach, 219 N.J. 58, 74 (2014).  The New Jersey Constitution provides a similar guarantee.  See N.J. Const. art. I, ¶ 10; Roach, 219 N.J. at 74.   The Confrontation Clause prohibits the use of out-of-court testimonial hearsay not tested by cross-examination unless the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination.  Roach, 219 N.J. at 74 (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)).  Accordingly, the Confrontation Clause is "implicated when a witness refers to specific information from a non-testifying third party."  State v. Weaver, 219 N.J. 131, 152 (2014).  The Confrontation Clause is violated when the hearsay statement is testimonial or meant to establish events relevant to the current prosecution.  Davis v. Washington, 547 U.S. 813, 822 (2006).

Defendant contends that her constitutional right to confront Fontanez was violated when Postal Inspector Crockett testified that Fontanez had informed the service that defendant was receiving packages of cocaine. Defendant's argument has several flaws.

First, under direct examination, Crockett did not mention Fontanez. Instead, Crockett testified that he had been supplied with information that suggested that there were illegal substances being mailed to addresses in Bridgeton. Accordingly, he did not mention Fontanez, nor did he imply that the information implicated defendant.

Crockett's testimony arguably could have suggested that the postal service had received information from a third-party concerning the illegal shipments. That potential problem, however, was cured because the court sustained defendant's objection to the testimony and gave a curative instruction to the jury. Specifically, the trial court told the jury that they were prohibited from considering Crockett's testimony as evidence of defendant's guilt. Instead, the jury could consider the testimony only to explain why law enforcement took further action. Consequently, that instruction cured any potential problem with Crockett's direct examination.

A-1604-18T3

The specific mention of Fontanez occurred during cross-examination of Crockett by counsel for co-defendant Gomez. Defendant did not object to that testimony. Moreover, when the State clarified the information concerning Fontanez on re-direct, defendant again did not object. Accordingly, we review that testimony under the plain error standard. See R. 2:10-2. Unless the testimony was clearly capable of producing an unjust result, we will disregard it. State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting State v. Macon, 57 N.J. 325, 336 (1971)) (noting reversal is required "only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached'"); State v. J.R., 227 N.J. 393, 417 (2017) (quoting State v. W.B., 205 N.J. 588, 614 (2011)) (observing that reversal should not follow "a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result").

In none of the referenced testimony concerning Fontanez did any of the witnesses say that Fontanez suggested that defendant was receiving packages of cocaine. Instead, the witnesses who testified about Fontanez stated that he had identified certain addresses to which packages of cocaine were being shipped. The testimony concerning Fontanez explained why the investigation was initiated but did not identify defendant as someone engaging in criminal activity.

A-1604-18T3

Consequently, we discern no violation of defendant's Confrontation Clause rights or any plain error.

Defendant correctly contends that the assistant prosecutor in closing made an improper remark. During her closing, the prosecutor stated: "Now, remember, Danny Fontenez [sic] came in and gave information about Duchess Place and specifically cocaine being trafficked from Puerto Rico to Duchess Place, specifically by [defendant]. Not Daniel Diaz, [defendant]." Defendant made no objection to that inaccurate remark.

The prosecutor's summation was improper because it was inconsistent with the actual testimony and evidence at trial. Nevertheless, we hold that the statement was harmless error. At trial, the State presented strong evidence that defendant was part of a conspiracy. That evidence included testimony by various investigators who witnessed defendant picking up packages known to contain cocaine. Even more significantly, the jury heard testimony from Cartagena, a cooperating witness who was part of the conspiracy. She described for the jury the nature of the conspiracy and recounted defendant's reaction to being informed of the raid on Duchess Place. Consequently, when viewed in context, the assistant prosecutor's improper statement during closing was not

12

capable of producing an unjust result given the State's otherwise strong and compelling evidence.

B.     Testimony Concerning Daniel Diaz's Guilty Plea

Next, defendant asserts that there was testimony and comments that her brother Daniel had pled guilty to conspiracy, but Daniel himself did not testify. Accordingly, defendant contends that the testimony and comments were prejudicial and violated her right to confront Daniel.

It is well-established that the State cannot present evidence that a non-testifying defendant has pled guilty or been convicted of the same or related charges. State v. Rucki, 367 N.J. Super. 200, 204 (App. Div. 2004). Moreover, evidence of a co-defendant's guilty plea cannot be used to infer the guilt of another defendant. State v. Adams, 194 N.J. 186, 208 (2008) (citing State v. Stefanelli, 78 N.J. 418, 430-33 (1979)).

When evidence of a guilty plea by a testifying co-defendant is admitted, the trial court must instruct the jury that the plea can be considered only as to the credibility of that witness. Ibid. The Confrontation Clause's "truth finding function" is "uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." State v. Laboy, 270 N.J. Super. 296, 303 (App. Div. 1994)

(quoting <u>Lee v. Illinois</u>, 476 U.S. 530, 541 (1986)).  We have explained how these two rules work together:

> [T]his rule is based on both the rule against hearsay and the Sixth Amendment right of confrontation.  The Court [in <u>Stefanelli</u>] observed that a co-defendant's guilty plea also may be misleading because "[t]here may be, and often are, many undisclosed or collateral factors actuating a guilty plea in addition to guilt in fact."  Consequently, the [<u>Stefanelli</u>] Court concluded that even when a co-defendant testifies at trial, his guilty plea is inadmissible as substantive evidence of the defendant's guilt.  It is only "admissible to affect [the co-defendant's] credibility as a witness."  Therefore, the trial court is required "to give the jury a proper cautionary instruction as to the limited use of this testimony for credibility purposes."
>
> [<u>Rucki</u>, 367 N.J. Super. at 206 (third and fifth alterations in original) (quoting <u>Stefanelli</u>, 78 N.J. at 431, 433-34).]

A defendant, however, can introduce testimony concerning a co-defendant's guilty plea, provided that testimony is otherwise admissible.  <u>See</u> <u>State v. Tormasi</u>, 443 N.J. Super. 146, 149 (App. Div. 2015).  In <u>Tormasi</u>, the defendant had been convicted of murdering his mother.  He filed a petition for post-conviction relief, contending that his father had given an affidavit stating that the father, not the defendant, had murdered the mother.  The PCR court denied the application, ruling that the affidavit was inadmissible hearsay.  <u>Id.</u> at 149-50.  We reversed.  We explained:

An accused is entitled to offer a statement against interest made by another, usually for the purpose of demonstrating the guilt of another, so long as the statement falls within the other parameters of N.J.R.E. 803(c)(25); indeed, it is well-established that this aspect of the rule must "not be applied mechanistically to defeat an accused's ability to present a defense."

[Id. at 153 (citations omitted) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 803(c)(25) (2015)).]

At trial, the State did not introduce evidence of Daniel's guilty plea. Instead, that evidence was brought out during cross-examination by counsel for co-defendant Gomez. During cross-examination of Lieutenant Donato, counsel for Gomez elicited that Daniel and Cartagena had pled guilty to conspiracy. Moreover, Gomez himself testified that Daniel had pled guilty to conspiracy. Defendant did not object to that testimony. Indeed, in closing arguments both co-defendant Gomez and defendant argued that Daniel's guilty plea showed that he was the guilty person and he had tricked Gomez and defendant into unwittingly facilitating his illegal activities.

After that door was opened, and in response to defendants' arguments, the assistant prosecutor asked follow-up questions concerning Daniel's guilty plea and made a responding argument that Daniel was part of an overall conspiracy,

but not its ringleader. In that regard, the assistant prosecutor in closing arguments asserted:

> Daniel Diaz was involved. He had his own role. He was getting packages too. He was getting packages from [Cartagena's] house. He, in fact, got the second package and brought it in on April 7th when the second package was delivered to 501 North Pearl Street . . . So don't get me wrong[.] Daniel Diaz is guilty of conspiracy like he pled to.

Because co-defendant Gomez brought out that Daniel had pled guilty and because both Gomez and defendant argued that Daniel was guilty but they were not, there was no violation in the State's use of that testimony, nor was there a violation of defendant's right of confrontation. Instead, defendant used Daniel's guilty plea as part of her defense strategy. The testimony was not being offered against her; rather, it was admissible hearsay under N.J.R.E. 803(c)(25), which Gomez and she used to present a defense.

The State's follow-up questioning and responding arguments in closing did not constitute reversible error. Gomez and defendant had opened the door, and the State was therefore allowed "to place the evidence in its proper context." See State v. Prall, 231 N.J. 567, 582-83 (2018) (quoting State v. James, 144 N.J. 538, 554 (1996)). Moreover, when the State asked for an instruction related to Daniel's guilty plea, defendant argued that an instruction was not necessary.

A-1604-18T3

Indeed, defense counsel suggested that the State's better course was to address the issue in its closing. Accordingly, to the extent that there was any error, it was invited and, therefore, not a basis for reversal. State v. Corsaro, 107 N.J. 339, 345 (1987) (citation omitted) (pointing out that trial errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal").

Furthermore, because defendant did not object at trial, her arguments are evaluated under the plain error doctrine. Trinidad, 241 N.J. at 445; J.R., 227 N.J. at 417. Given that the testimony concerning Daniel's guilty plea was elicited by a co-defendant and used by defendant, we discern no error that was clearly capable of producing an unjust result.

C. The Alleged Cumulative Errors

Defendant argues that, even if not individually warranting reversal, the admission of evidence of Fontanez's statements and Daniel's guilty plea had a cumulative impermissible effect on the jury and requires reversal of the conviction. We disagree.

The cumulative effect of trial errors can merit reversal when they "cast[] doubt on the fairness of defendant's trial and on the propriety of the jury verdict that was the product of that trial." State v. Jenewicz, 193 N.J. 440, 447 (2008).

A-1604-18T3

Accordingly, reversal can be justified when the cumulative effect of a series of errors is harmful, even if each error by itself is harmless. Ibid.

The two alleged errors – admission of testimony regarding Fontanez's statement and Daniel's guilty plea – do not rise to the level of having rendered the trial unfair. The State presented extensive testimony, including testimony concerning surveillances, during which defendant was seen collecting packages that contained cocaine. The testimony concerning Fontanez and Daniel's guilty plea were relatively limited, considering the entire trial spanned almost three months and included testimony from twenty witnesses. Moreover, as already detailed, these two alleged errors were part of the defense's trial strategy and do not warrant reversal of the jury verdict.

D. The Sentence

Finally, defendant contends that her sentence was excessive and illegal. Specifically, she argues that the trial court improperly relied on aggravating factor five in finding that she was involved in organized criminal activity. She also argues that the trial court erroneously disregarded mitigating factor seven, her lack of criminal history.

We review sentencing determinations under a deferential standard. State v. Grate, 220 N.J. 317, 337 (2015) (citing State v. Lawless, 214 N.J. 594, 606

(2013)).  We do not substitute our judgment for "the judgment of the sentencing court."  Lawless, 214 N.J. at 606 (first citing State v. Cassady, 198 N.J. 165, 180 (2009); and then citing State v. O'Donnell, 117 N.J. 210, 215 (1989)).  Instead, we will affirm a sentence unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Miller, 237 N.J. 15, 28 (2019) (alteration in original) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).]

In sentencing defendant, the trial court analyzed the applicable aggravating and mitigating factors.  The court found aggravating factor three, the risk of re-offense; five, the presence of organized criminal activity; and nine, the need for deterrence.  N.J.S.A. 2C:44-1(a)(3), (5), and (9).  The court adequately identified the facts supporting each of those aggravating factors.

The court then analyzed the mitigating factors and found mitigating factor seven, that defendant lacked a significant prior criminal history, N.J.S.A. 2C:44-1(b)(7), but gave that factor only "slight weight" because "the evidence that was brought out of trial[] . . . [revealed] that there was criminal activity going on

19

here long before the [i]ndictment alleged." Consequently, the court found that defendant "had a substantial period of lawlessness, of organized criminal activity, prior to the [i]ndictment." That finding is also supported by adequate evidence in the record.

The trial court then concluded that the aggravating factors substantially outweighed the mitigating factors and sentenced defendant to nine years in prison with four and a half years of parole ineligibility. That sentence is within the guideline range for a second-degree crime; we discern no abuse of discretion, nor are we shocked by the sentence. Therefore, we reject defendant's arguments concerning her sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20

A-1604-18T3